## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**LYNNE J. HOFFMAN,**

        **Plaintiff,**

                                **:**

  **v.**
                                  **Case No. 2:19-cv-4360**
                                  **Judge Sarah D. Morrison**

**NATIONWIDE MUTUAL**
**INSURANCE COMPANY**               **Magistrate Judge Chelsey M.**
**SHORT-TERM DISABILITY**     **:**    **Vascura**
**PLAN,**

        **Defendant.**

## OPINION AND ORDER

Plaintiff Lynne Hoffman brings this action under Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA") [29 U.S.C. § 1132] following a denial of short-term disability ("STD") benefits from Defendant Nationwide Insurance Companies and Affiliates Plan for *Your Time* and Disability Income Benefits (the "Plan").[1] (*See* Compl., ECF No. 1.) The Administrative Record was filed under seal. (Admin. R., ECF No. 23.) Both parties moved for judgment thereon. (ECF Nos. 24, 25.) Ms. Hoffman and the Plan have each responded to the other's motion (ECF Nos. 25, 28), and replied in support of their own (ECF Nos. 28, 29). The matter is now ripe for consideration. For the reasons set forth below, Ms.

---

[1] Although Ms. Hoffman's Complaint identifies the Defendant as "Nationwide Mutual Insurance Company Short Term Disability Plan," the Plan Document makes clear that the Defendant's proper name is the Nationwide Insurance Companies and Affiliates Plan for *Your Time* and Disability Income Benefits. (*See* Admin. R., PAGEID # 49. *See also* Answer, fn. 1, ECF No. 3.)

Hoffman's Motion for Judgment on the Administrative Record (ECF No. 24) is **GRANTED** and the Plan's Motion for Judgment on the Administrative Record (ECF No. 25) is **DENIED**.

## I.    BACKGROUND

Ms. Hoffman began working for Nationwide Mutual Insurance Company in January 2015. (Admin. R., PAGEID # 367.) Shortly before, on November 30, 2014, Ms. Hoffman was injured in an automobile accident. (*See id.*, PAGEID # 202.) From that point forward, she was consistently treated for right shoulder pain, ultimately diagnosed as a "near full-thickness tear" and "significant edema, fraying and thinning" of the tendons in her rotator cuff (*id.*, PAGEID # 216) and neurogenic thoracic outlet syndrome[2] (*id.*, PAGEID # 225–26).  Medical records covering 2015–2018 reflect that Ms. Hoffman sought relief from Botox injections (*see, e.g., id.,* PAGEID # 223–24), massage therapy (*id.*, PAGEID # 205), physical therapy (*id.*), acupuncture (*id.*, PAGEID # 209), and prescription pain medication (*see, e.g., id.,* PAGEID # 205), all with limited to no success. On April 4, 2017, Ms. Hoffman underwent surgical resection of her first right rib and neurolysis of the brachial

---

[2] "The thoracic outlet is the ring formed by the top ribs, just below the collarbone. Thoracic outlet syndrome (TOS) occurs when nerves or blood vessels are compressed by the rib, collarbone or neck muscles at the top of the outlet. . . . Neurogenic TOS occurs when the nerves leading from the neck to the arm (the brachial plexus) is compressed. More than 90 percent of cases are neurogenic." *Thoracic Outlet Syndrome*, Johns Hopkins Medicine, https://www.hopkinsmedicine. org/health/conditions-and-diseases/thoracic-outlet-syndrome (last visited Sept. 15, 2021). Symptoms include pain or weakness in the shoulder and arm; tingling or discomfort in the fingers; arm that tires quickly; and atrophy of the pad of the thumb and muscle that leads to the thumb (rare). *Id.* "Symptoms may come and go, but they are often made worse when arms are held up. The longer the arms stay up, the worse the symptoms can get." *Id.*

plexus, performed by Ying Wei Lum, MD, MPH, at Johns Hopkins. (*Id.*, PAGEID # 230.)

Ms. Hoffman initially showed improvement after surgery, and returned to work in July 2017. (*See id.*, PAGEID # 242.) A week later, she presented to her primary care physician, Brian D'Eramo, DO, with "complete return of pain and inability to maintain function with increased pain medication usage." (*Id.*) Ms. Hoffman reiterated her regression to Dr. Lum at her six-month post-operative appointment. (*Id.*, PAGEID # 175–81.) Dr. Lum reported the following results of "TOS exams" performed at that visit:

> Patient had presentation of the radial pulse on hyperabduction maneuvers. Patient was unable to perform the elevated arm stress test (EAST) and had pain and fatigue after 60 sec[ond]s on the [right]. Patient had pain on the ipsilateral neck on the upper extremity tension test (Elvey's). No scalene tenderness on the [right], no [right] pec minor tenderness + right trapezius tenderness.

Dr. Lum recommended that Ms. Hoffman receive trigger point injections—but they provided only temporary relief. (*See id.*, PAGEID # 249–50.)

In August 2017, Ms. Hoffman applied for and was awarded STD benefits under the Plan. (*Id.*, PAGEID # 144.) At the time, she held the position of Claims Specialist III—Casualty and Bodily Injury. (*Id.*, PAGEID # 167–70.) A Nationwide Claims Specialist III:

> [i]nvestigates, evaluates, negotiates and brings to final resolution complex and catastrophic casualty losses; May investigate, evaluate, negotiate and bring to final resolution Under Insured and Uninsured coverage losses as dictated by local Jurisdiction. May have oversight, control and supervision of attorney represented casualty losses. Losses may be handled via telephone; Responsible for disposition of claims in accordance with prescribed authority, claims handling experience and Best Claims[.] May handle attorney represented and litigated files

3

through conclusion. Promptly and effectively handles to conclusion assigned claims with little to no direction and oversight which may include complex and catastrophic casualty losses. Promptly and effectively handles to conclusion all assigned claims with little to no direction and oversight . Makes decisions within delegated authority, recommends settlement values in the disposition of serious and sometimes complex claims as outlined in company policies and procedures. Adheres to high standards of professional conduct consistent with the delivery of superior service. Handles to conclusion complex and catastrophic casualty losses. Makes decisions within maximum authorization; recommends settlement values in the disposition of serious and sometimes complex claims. Accurately pays claims based on policy provisions, state mandates and/or fee schedules. Opens, closes and adjusts reserves in accordance with company practices designed to ensure reserve adequacy. Recommends Special Reserves where necessary; In accordance with Corporate Reserving Guidelines; Adheres to file conferencing notification and authority procedures. Maintains current knowledge of: court decisions which may impact the claims function; current principles and practices in the claims function; material damage techniques and repair technology innovations; and policy changes and modifications; May be required to maintain knowledge of other functions within assigned discipline. This may require attendance at various seminars or training sessions. Serves as a mentor to less experienced claims associates and assists with training/presentations as assigned by claims management. Creates and analyzes severe incident reports, reinsurance reports and other information to home office, claims management, and underwriting. Partners with SIU and Subrogation to identify fraud and subrogation opportunities. Assists or prepares files for suit, trial, or subrogation. (Property/MD/Casualty). Consults claims staff and defense counsel for discovery processes, suit file/trial strategy as related to case-specific issues. Delivers a positive On-Your-Side customer service experience to all internal, external, current and prospective Nationwide customers.

(*Id.*, PAGEID # 168.) The role is performed in the following working conditions:

Normal office environment. May require ability to sit and use telephone and personal computer for extended periods of time. Must be willing to work irregular hours and to travel with possible overnight requirements. Must be available to work catastrophes (CAT) requiring travel to CAT site with multiple on-site responsibilities and/or for extended periods of time. Extended and/or non-standard hours as required.

(*Id.*, PAGEID # 170.)

4

Ms. Hoffman's STD benefits were discontinued effective October 2, 2017. (*See id.*, PAGEID # 156.) After her appeals were denied, Ms. Hoffman filed suit against the Plan, alleging that she was wrongly denied Plan benefits to which she is entitled. (Compl.)

### A. Relevant Plan/Policy Provisions

The Administrative Record includes the Plan Document. (*See* Admin. R.) Provisions relevant to the case now before the Court are summarized or excerpted below.

Nationwide Mutual Insurance Company established and maintains the Plan, for the benefit of its eligible employees, to provide long- and short-term disability income benefits and other time-off benefits. (*See id.*, PAGEID # 50.) The Plan is an employee welfare benefit plan subject to ERISA. (*Id. See also* ERISA § 3(1) [29 U.S.C. § 1102(1)].) The Plan is funded through a voluntary employees' beneficiary association ("VEBA") titled the Nationwide Mutual Insurance Companies & Associates Health Care Trust. (*Id.*, PAGEID # 108. *See also* 26 U.S.C. § 501(c)(9).) The VEBA's assets are comprised of participant and employer contributions. (*Id.*, PAGEID # 108.)

Aetna Life Insurance Company ("ALIC") serves as Claims Administrator for the STD benefits provided under the Plan. (*See, e.g., id.*, PAGEID # 126–28.) In that role, ALIC provides certain administrative services in connection with adjudication and payment of initial claims and first-level appeals for STD benefits. (*See id.*, PAGEID # 59.) Nationwide's Benefits Administrative Committee ("BAC") handles second-level appeals. (*Id.*)

5

The Plan Document provides the following details pertaining to the Plan's application and administration:

### ARTICLE I – Definitions

\* \* \*

### 1.10 – Benefits Administrative Committee
"Benefits Administrative Committee" means the committee established by the Board of Directors of the Plan Sponsor [Nationwide Mutual Insurance Company] . . . . Members of the Benefits Administrative Committee are appointed by the Board of Directors of the Plan Sponsor.

\* \* \*

### 1.57 – Plan Administrator
"Plan Administrator" means the Benefits Administrative Committee.

\* \* \*

### 1.65 – STD Disability or STD Disabled
"STD Disability" or "STD Disabled" means a disability or disablement that results from a substantial change in medical or physical condition due to a specific Illness or Injury that prevents an Eligible Associate from working their current position. A Physician must document the specific Illness or Injury.

(*Id.*, PAGEID # 57–65 (all emphasis in original).)

### ARTICLE III – Short-Term Disability Income Benefits

\* \* \*

### 3.05 – Duration of Short-Term Disability Income Benefits

### 3.05.01 – Continuation of Short-Term Disability Income Benefits

(a)     Subject to [certain limitation and exclusions], Short-Term Disability Income Benefits will continue for the maximum coverage period if the STD Disabled Employee continues to meet the following requirements:

(i)     is STD Disabled;

6

(ii)    seeks the highest level of treatment from the Physician with the highest level of specialty that is available;

(iii)    submits to an independent medical examination when determined to be appropriate by the Plan Administrator, or its delegate[; and]

(iv)    continues to provide medical records, attending Physician statements, and any other documentation required by the Plan Administrator, or its delegate to support the STD Disability.

(b)    Failure to meet the requirements in Section 3.05.01(a) will result in suspension of Short-Term Disability Income Benefits and may result in termination of Short-Term Disability Income Benefits.

\* \* \*

### 3.05.02 – Maximum Period of Short-Term Disability Income Benefits

(a)    Short-Term Disability Income Benefits will end on the last day of the sixth consecutive calendar month of STD Disability. . . .

(*Id.*, PAGEID # 72–77 (all emphasis in original).)

### <u>ARTICLE VIII – Claims and Appeals</u>

\* \*\*

### <u>8.02 – Claims and Appeals under the Short-Term Disability Income Benefit Program and Long-Term Disability Income Benefits Program (not to include eligibility and enrollment claims and appeals)</u>

\* \* \*

### 8.02.02 – Initial Claim for Benefits

\* \* \*

(b)    It is the responsibility of the Active Associate to provide the Claims Administrator with documentation supporting her claim for Short-Term Disability Income Benefits and/or Long-Term Disability Income Benefits. Such documentation must be of the nature that would allow the Claims Administrator to determine whether the Active Associate meets the definition of STD

Disability, STD Disabled, LTD Disability or LTD Disabled, as applicable, under the Plan.

* * *

### 8.02.05.01 – First Level of Appeal

(a)     A Claimant will have a reasonable opportunity for a full and fair review of a claim and Adverse Benefit Determination; . . .

(c)     A Claimant will have the opportunity to submit written comments, documents, records, and other information relating to the Claim for Benefits; . . .

(e)     The review of the Adverse Benefit Determination will take into account all written comments, documents, records, and other information submitted by the Claimant relating to the claim to the Claims Administrator, without regard to whether such information was submitted or considered in the initial benefit determination;

(f)     The review will not afford deference to the initial Adverse Benefit Determination and will be conducted by an appropriate named fiduciary of the Plan who is neither the individual who made the Adverse Benefit Determination that is the subject of the appeal nor the subordinate of such individual;

(g)     In deciding an appeal of any Adverse Benefit Determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate, the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment;

(h)     The response will identify the medical or vocational experts whose advice was obtained on behalf of the Claims Administrator in connection with a Claimant's Adverse Benefit Determination, without regard to whether the advice was relied upon in making the benefit determination; and

(i)     The heath care professional engaged for purposes of a consultation under paragraph (g) will be an individual who is neither an individual who was consulted in connection with the

Adverse Benefit determination that is the subject of the appeal, nor the subordinate of any such individual.

**8.02.05.02 – Second Level of Appeal**

(a) The Plan Administrator will decide second level appeals, but may require appeal information for a Claimant's appeal request to be submitted to the Claims Administrator, in writing, within the timeframe established by the Plan Administrator. If the appeal is related to clinical matters, the review will be done in consultation with a health care professional with appropriate expertise in the medical field and who was not involved in the prior determination. The Plan Administrator may consult with or seek the participation of medical experts as part of the appeal resolution process. By submitting an appeal request, the Claimant consents to this referral and the sharing of pertinent medical claims information with the medical expert(s).

(b) The Plan Administrator, who was not involved in deciding the initial Claim for Benefits, is the qualified "individual" or group of individuals, i.e., committee, who will decide the appeal.

(*Id.*, PAGEID # 95–99 (all emphasis in original).)

## <u>ARTICLE IX – Administration</u>

### <u>9.01 – General Plan Administration</u>
(a) The Plan Administrator is the "Named Fiduciary" within the meaning of ERISA Section 402;

(b) Except as provided in Section 9.06 (relating to oversight of investment of the Plan's assets, if any), the Plan Administrator is responsible for all aspects of administration of the Plan, including the payment of benefits; . . .

\* \* \*

### <u>9.02 – Plan Administrator's Authority</u>
(a) The Plan Administrator has the authority, power, and discretion to construe and interpret the provisions of the Plan and to decide all questions as to eligibility to participate. Any such determination will be conclusive and binding upon all persons having an interest in or under the Plan;

(b) The Plan Administrator has the authority to determine the payment of Plan benefits. The Plan Administrator will pay Plan

benefits only if it decided in its discretion that the Claimant is entitled to the benefits; . . .

\* \* \*

**9.07 – Claims Administrator**
The Claims Administrator shall provide consulting services to the Plan Administrator in connection with the operation of the Plan and shall perform such other functions and services, including the processing and payment of claims, as may be delegated to it.

(*Id.*, PAGEID # 101–04 (all emphasis in original).)

## B. Administrative Claim

### 1. Ms. Hoffman's claim for STD benefits was first approved, but benefits were terminated effective October 2, 2017.

Ms. Hoffman's initial claim for STD benefits under the Plan was approved on August 29, 2017. (*Id.*, PAGEID # 144–45.) In other words, ALIC determined that Ms. Hoffman could not perform the duties of a Claims Specialist III at that time. On October 9, 2017, ALIC re-certified and extended her benefits through October 1, 2017. (*Id.*, PAGEID # 150–51.) The notification letter states, in relevant part:

Based on the information we have about your medical condition, we've approved your Short Term benefits through 10/01/2017.

We have been informed that you were release to returned [*sic*] to work on 10/02/2017. Therefore, your claim has been closed.

(*Id.*) The notification letter[3] refers to Dr. D'Eramo's September 21, 2017 response to ALIC's Request for Medical Information, reproduced below:

---

[3] Although the notification letter sent to Ms. Hoffman states that her benefits were being discontinued because she was *released* to return to work, some correspondence from ALIC to Nationwide indicates that the benefits were discontinued because Ms. Hoffman in fact *returned* to work. (*See* Admin. R., PAGEID # 156.)

(*Id.*, PAGEID # 155.) Two days before sending the response, Dr. D'Eramo also faxed

a letter to ALIC, which states:

> To Whom It May Concern:
>
> Lynne Hoffman is a patient of our practice. Is it medically necessary that she work from home at this time.
>
> If you have any questions, please contact me.

(*Id.*, PAGEID # 148–49.) Ms. Hoffman in fact never returned to work, and

Nationwide was unable to accommodate the work-from-home limitation. (ECF No.

24, 7.)

### 2. ALIC denied Ms. Hoffman's first-level appeal of her benefit termination.

On March 1, 2018, Ms. Hoffman appealed the benefit termination. (*See*

Admin. R., PAGEID # 162–66.) With her appeal, she facilitated ALIC's receipt of

various updated treatment records. (*See id.*, PAGEID # 174–99.) Ms. Hoffman also

provided a February 13, 2018 Attending Physician Statement ("APS") from Dr.

D'Eramo and a December 31, 2017 letter from Dr. Lum. (*See id.*, PAGEID # 157–58,

160–61.) Dr. D'Eramo's APS indicates that Ms. Hoffman was limited to only occasional (0.5–2.5 hours) sitting, standing, walking, driving, lifting, pushing/pulling, bending/stooping, keying/computer, hand grasping, repetitive motion, and reaching. (*Id.*, PAGEID # 160.) It further indicates that she could tolerate no weight. (*Id.*) Dr. D'Eramo examined Ms. Hoffman on February 9, 2018, and signed the APS on February 13. (*Id.*)

Dr. Lum's letter explains Ms. Hoffman's nTOS diagnosis. (*Id.*, PAGEID # 157–58.) Dr. Lum begins by acknowledging that nTOS "is a subjective and controversial diagnosis" because, "unlike cancer, where a definitive biopsy of abnormal cells may be obtained to confirm the diagnosis, such a diagnostic/specific test for nTOS does not exist." (*Id.*) Dr. Lum goes on to explain that, under the accepted standards, an nTOS diagnosis is appropriate where a patient presents with three of the following four criteria:

- Local findings, including symptoms consistent with irritation or inflammation at the site of compression, along with symptoms due to referred pain in the areas near the thoracic outlet, and pain on palpation of the affected area.

- Peripheral findings, including arm and hand symptoms consistent with central nerve compression (such as numbness, pain, paresthesias, vasomotor changes, and weakness), often exacerbated by maneuvers that either narrow the thoracic outlet (lifting the arms overhead) or stretch the brachial plexus (dangling, driving, walking/running).

- Absence of other reasonably likely diagnoses that might explain the majority of symptoms.

- Positive response to test injection procedure.

12

(*Id.*) Dr. Lum notes that Ms. Hoffman satisfied all four criteria, and he "continue[s] to believe that she has had appropriate evaluations and treatment for nTOS." (*Id.*, PAGEID # 158.)

ALIC issued its determination on review on June 14, 2018. (*Id.*, PAGEID # 307.) The notice of benefit determination explains:

> Your benefit was approved through October 1, 2017, and your benefit was terminated as of October 2, 2017, because it was determined that the medical information did not support your continued inability to perform the duties of your occupation as a Claim Specialist III. . . .
>
> Based on our review and consideration of all the available information in your claim file, we determined there is clinical evidence to support restrictions and limitations during the period in question. However, these restrictions and limitations would not prevent you from working in your position as a Claim Specialist III.
>
> We also had an independent doctor who specializes in physical medicine rehabilitation and pain medicine review the information. The reviewing physician also discussed your condition with Dr. Lum during a telephone consultation. Dr. D'Eramo's office confirmed that Dr. D'Eramo will not participate in a telephone consult and has no further comment or information to offer for the review. . . .
>
> The reviewing physician concluded that the discussion with Dr. Lum is consistent with the reviewed documentation, but the findings are not of a severity in which to prevent function. You do have some limited range of motion and your symptoms are somewhat consistent with the medical history, but the severity of your symptoms is out of proportion to the current findings.
>
> There is no evidence of ongoing severe and uncontrolled symptoms and/or a level of impairment due to your neurogenic thoracic outlet syndrome, brachial plexus disorder, and/or any other reported condition that would support the restrictions and limitations noted by your provider(s). Electro-diagnostic studies are normal and physical examinations are without significant abnormality other than some limited range of motion and sensory change. There is no evidence of loss of strength, or other significant exam findings. The EMG was normal and the MRI of your cervical spine showed some degenerative disc changes. An ultrasound had no occlusion or deep vein thrombosis but

had flow changes with arm position, which may suggest thoracic outlet syndrome.

However, the reviewing physician further concluded that there is evidence to support the following reasonable restrictions due to your limited range of motion and altered sensation in your right upper extremity:

- You have the ability to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently
- You have the ability to lift overhead 10 pounds occasionally
- You have the ability to reach overhead occasionally
- No restrictions with reaching at waist level or below
- No climbing ladders, working at unprotected heights, operating heavy machinery, and crawling
- You have the ability to grip and grasp frequently
- No restrictions for fingering and handling
- No restrictions with sitting, standing, and walking
- No restrictions with using your lower extremities for squatting, kneeling, crouching and climbing stairs

The reviewer also noted your prescribed medications are not causing side effects or impacting your ability to function.

. . . [T]hese restrictions and/or limitations are within the scope of your occupational requirements, which are sedentary in nature. The evidence presented does not substantiate a severity of symptoms and/or functional impairment from a physical standpoint that would have prevented you from working as a Claim Specialist III during the period in question. Therefore, we are unable to approve your benefit as of October 2, 2017.

(*Id.*, PAGEID # 307–08.)

The Administrative Record includes a copy of the report created by the reviewing physician, Howard L. Grattan, MD. (*Id.*, PAGEID # 310–17.) The report reflects that Dr. Grattan reviewed Ms. Hoffman's file, including Ms. Hoffman's own statements and treatment notes from, *inter alia*, Dr. D'Eramo and Dr. Lum. (*Id.*, PAGEID # 311.) The report also includes a summary of Dr. Grattan's peer-to-peer

14

consult with Dr. Lum. (*Id.*, PAGEID # 314–15.) The report concludes with Dr.

Grattan's response to specific Referral Questions, including the following:

> [Q:] Was there any evidence of a significant change or improvement in the claimant's condition as of 10/02/2017? Why or why not? Please explain in detail either way and address if there is evidence or not of an improvement of symptoms and/or a significant change in her condition.

> [A:] There was not significant change in the claimant's condition as of 10/02/2017. MRI from 2016 showed acromioclavicular joint changes with impingement in the rotator cuff. The claimant is status post first rib resection in 04/2017. Post operatively it was noted that her pain symptoms were likely due to neuropathy. On 10/11/2017, she initially had up to 75% improvement but since going back to work describes increased swelling with activity as well as heaviness and coolness to the wrist with a pulling sensation at the posterior neck. Electrodiagnostic studies have been normal. Subsequent examinations reveal no evidence of weakness. Range of motion is slow with the right upper extremity and sensation is decreased however there is not significant change and initially the claimant did have improvement post operatively.

(*Id.*, PAGEID # 315.)

### 3. The BAC denied Ms. Hoffman's second-level appeal.

Ms. Hoffman submitted a second-level appeal on August 7, 2018, challenging ALIC's decision upholding the termination of her STD benefits. (*Id.*, PAGEID # 344.) She also transmitted a copy of a Rehabilitation Assessment Report prepared by David A. Zak, MEd, CRC, LPC, CLCP, ABVE/D and a notice of award indicating that she was entitled to Social Security disability benefits for a disability dating back to August 7, 2017. (*Id.*, PAGEID # 347–79.)

The BAC engaged an orthopedic physician to review Ms. Hoffman's claim file. (*Id.*, PAGEID # 332.) The reviewing physician, Johnathan Gross, MD, is a board-certified orthopedic surgeon. (*Id.*, PAGEID # 338.) Dr. Gross provided his review of the claim file, but first stated, "This review is from an Orthopedic perspective." (*Id.*,

PAGEID # 332.) Following review and summary of the medical records in the claim file, Dr. Gross also responded to specific Referral Questions, including the following:

> [Q:] Does the clinical information corroborate the need for restrictions and limitations? If so please indicate what the appropriate restrictions and limitations are the [*sic*] anticipated duration of the restriction and limitation?

> [A:] Based on the available medical records and [*sic*], the clinical information does not corroborate the need for restrictions and limitations from 10/07/2017 to present.

> Based on the available medical records, the claimant had wrist, right shoulder, and neck pain. There was no imaging study of the wrist and no objective examination findings for the wrist to determine the severity. The available subjective findings of the wrist does not indicate the severity. The objective imaging study of the right shoulder revealed impingement of the rotator cuff, severe tendinosis, however, the objective findings of the right shoulder in the form of examination does not indicate the severity. Further there were no consistent objective examination findings of the right shoulder to determine the severity.

> The reported radiating pain comes under neurology and will be deferred.

> The objective imaging study of the cervical spine does not indicate the severity. It was reported that the claimant had complaints of deltoid swelling with any activity, however, the severity of swelling was not mentioned. Thus, based on the available medical records the clinical information does not corroborate the need for restrictions and limitations in my opinion.

(*Id.*, PAGEID # 335–36.)

In a letter dated October 9, 2018, BAC Secretary Cynthia Hughes informed Ms. Hoffman that, after review of her letter of appeal, ALIC's claim file, the Plan, and Dr. Gross's report, the BAC had decided to uphold the denial of benefits. (*Id.*, PAGIED # 339–43.) The letter, citing Plan provisions 1.65 (Definition—STD Disabled) and 3.05.01 (Continuation of Short-Term Disability Income Benefits), states the BAC's conclusion as follows:

The Committee reviewed Dr. Gross's report as well as the other documents in the administrative record and concluded that there was insufficient evidence to establish that you met the definition of STD Disabled.

(*Id.*)

## II.  STANDARD OF REVIEW

In a challenge to denial of benefits under ERISA § 502, the plaintiff must prove, by a preponderance of evidence, that she is entitled to receive the benefit. *Javery v. Lucent Tech., Inc. Long Term Disability Plan*, 741 F.3d 686, 700–701 (6th Cir. 2014 (citing *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n. 4 (6th Cir. 2006)). The challenge is reviewed by the courts under a *de novo* standard—*unless* the plan expressly grants its administrator or fiduciary discretionary authority "to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). *See also Yaeger v. Reliance Std. Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996) (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 965 (6th Cir. 1990)). If a plan does grant discretionary authority, "application of the highly deferential arbitrary and capricious standard of review is appropriate[.]" *Yaeger*, 88 F.3d at 380. The parties here agree that the Plan grants discretionary authority to the BAC to interpret and administer the Plan according to its terms.

"A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from 'a deliberate principled reasoning process' and is supported by 'substantial evidence.'" *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (quoting *Baker v. United Mine Workers of Am. Health*

17

& *Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). Judicial review is no "rubber stamp"—rather the court examines the "quantity and quality of the medical evidence on each side." *Id.*, (citing *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). "[T]hough the [arbitrary and capricious] standard is not without some teeth, it is not all teeth." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1049, 1064 (6th Cir. 2014). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quoting *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)). "When reviewing a denial of benefits under ERISA, a court may consider only the evidence available to the administrator at the time the final decision was made." *McClain*, 740 F.3d at 1064 (citing *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998)).

## III.    ANALYSIS

### A.    Motions for Judgment on the Administrative Record

Ms. Hoffman argues in her Motion for Judgment on the Administrative Record that the BAC's denial of benefits was arbitrary and capricious. Specifically, Ms. Hoffman asserts that: (i) Nationwide suffers a conflict of interest in determining claims for STD benefits under the Plan; (ii) ALIC terminated her benefits on the incorrect understanding that she had returned to work; (iii) objective medical evidence in the record supports a conclusion that she was STD Disabled; (iv) the BAC erred in failing to consider her Rehabilitation Assessment Report and the Social Security Administration's disability determination; and (v) the BAC erred

in relying on Dr. Gross's file review.[4] Ms. Hoffman urges the Court to award the balance of her STD benefits under the Plan.

In its Motion for Judgment on the Pleadings, the Plan argues that the termination and denial of Ms. Hoffman's benefits was supported by substantial evidence and, therefore, must stand.

Ms. Hoffman's arguments are well-taken. The confluence of factors compels a finding that Ms. Hoffman's STD benefits were arbitrarily and capriciously terminated. She is entitled to an award of past-due benefits.

### 1. Nationwide's conflict of interest is a neutral factor.

Ms. Hoffman first argues that the Plan's administration and governance structure warrants an inference that the BAC's decision was arbitrary and capricious. Specifically, she argues that the BAC's decision is owed lesser deference in light of the inherent conflict of interest that arises from the Plan Sponsor having discretionary authority to decide claims. [5] *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). The Plan argues in response that no conflict of interest exists

---

[4] Ms. Hoffman makes various other arguments in briefing, including that the BAC's stated rationale for terminating her benefits constitutes *post hoc* rationalization. (*See* ECF No. 28, *generally*.) Because the above-stated factors are dispositive, the Court does not address Ms. Hoffman's remaining arguments.

[5] Although the parties frame the conflict-of-interest issue as impacting the standard of review, it is simply one factor impacting the Court's consideration of whether the Plan's benefit determination was arbitrary and capricious. *See Glenn*, 554 U.S. at 108 (holding that such a "dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case").

because Nationwide (which sponsors the Plan and appoints members to the BAC) does not directly fund the Plan, and only occasionally contributes to the VEBA. Although the Court is sympathetic to Ms. Hoffman's argument—and agrees that ordinary plan participants would not likely intuit the reasons why a VEBA-funded welfare plan is less problematic in this respect than a plan funded from its sponsor's general assets—there is no evidence that the BAC was actually affected by any financial conflict of interest. *See Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 664 (2013) (citing *Glenn*, 554 U.S. at 117). Accordingly, the Court declines to give the conflict significant weight in its determination.

### 2. ALIC's decision to discontinue benefits on the basis of Dr. D'Eramo's release for work from home weighs in favor of a finding for Ms. Hoffman.

Ms. Hoffman next argues that her STD benefits were terminated because ALIC believed she had returned to work on October 2, 2017, when in fact she had not. The record is ambiguous as to whether ALIC believed Ms. Hoffman had returned to full duty at the time it discontinued her benefits. (*Compare* Admin. R. PAGEID # 150 *with* PAGEID # 156.) The record is clear, however, that Ms. Hoffman was released to return to work <u>with restrictions</u>. (*Id.*, PAGEID # 148–49, 55.) ALIC failed to treat Dr. D'Eramo's work-from-home restriction as a functional limitation bearing on Ms. Hoffman's status as STD Disabled under the Plan.[6] In

---

[6] In its Motion for Judgment on the Administrative Record, the Plan argues that Ms. Hoffman did not assert a failure to accommodate claim under the Americans with Disabilities Act ("ADA"), and that her argument about the work-from-home restriction is "misplaced." (ECF No. 25, 26.) The Plan does not cite any authority for the proposition that an accommodation that could be evaluated under

light of Nationwide's denial of her request to work from home, the restriction indeed "prevent[ed Ms. Hoffman] from working [her] current position." (*Id.*, PAGEID # 65.) In his file review, Dr. Grattan confirmed that the medical evidence of record indicated no "significant change in [Ms. Hoffman's] condition as of [October 2, 2017]," that could otherwise account for the decision to terminate her benefits. (*Id.*, PAGEID # 315.) Accordingly, ALIC improperly terminated Ms. Hoffman's STD benefits in the first instance. This fact weighs in favor of finding that the BAC's decision upholding the termination of benefits was arbitrary and capricious. *Cf., Caesar v. Hartford Life and Accident Ins. Co.*, 464 F. App'x 431, 436 (6th Cir. 2012).

### 3. The BAC's failure to consider Ms. Hoffman's Social Security disability determination and Rehabilitation Assessment Report weighs in favor of a finding for Ms. Hoffman.

Ms. Hoffman further argues that the BAC erred in failing to consider the Social Security Administration's ("SSA") notice of award finding that Ms. Hoffman was disabled, and the Rehabilitation Assessment Report prepared by Mr. Zak, each of which was transmitted to the BAC with her notice of appeal. Although the Plan maintains that it first became aware of these documents only after Ms. Hoffman filed suit (*see* ECF No. 25, 22), they are referenced by name as enclosures in Ms. Hoffman's appeal notice, which the Plan does acknowledge having received. (Admin. R., PAGEID # 344–45. *See also id.*, PAGEID # 339.) The BAC's failure to ensure it reviewed the full record, despite clear indications that the record before it was

---

the ADA cannot also be a functional limitation considered for purposes of a disability benefits determination.

incomplete, weighs heavily in favor of finding that the BAC's decision was not the result of a deliberate and principled reasoning process. *See Boyd v. Am. Elec. Power Sys. Long-Term Disability Plan*, No. 2:06-CV-161, 2007 WL 2778667, at *6 (S.D. Ohio Sept. 21, 2007) (McCann King, M.J.) ("The fact that plaintiff's LTD benefits were terminated based on reviews of some but not all the evidence suggests that defendant's decision was not based on 'a deliberate, principled reasoning process.'") (quoting *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) *aff'd sub nom Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

As to the documents themselves, "there is no technical requirement to explicitly distinguish a favorable Social Security determination in every [ERISA] case." *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 446 (6th Cir. 2009). Indeed, there are "critical differences between the Social Security disability program and ERISA benefit plans." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832–34 (2003). Nonetheless, a plan administrator's failure to explain the reasons behind a decision inconsistent with the SSA's may weigh in favor of a finding that the administrator's decision was arbitrary or capricious. *See Wooden v. Alcoa, Inc.*, 511 F. App'x 477, 484 (6th Cir. 2013) (noting that "an 'SSA determination, though certainly not binding, is far from meaningless'") (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294 (6th Cir. 2005)). The Plan argues that, even if it had been reviewed, Ms. Hoffman's SSA determination would not alter the BAC's decision because it contained no explanation. Though the Plan's position finds some support in case law, *see Smith v. Life Ins. Co of N. Am.*, No.

2:09-CV-0719, 2011 WL 766071, at *10 (S.D. Ohio Feb. 25, 2011) (Graham, J.), Ms. Hoffman's SSA determination is still significant. The SSA awarded Ms. Hoffman disability benefits as of August 7, 2017—the same date that ALIC originally identified in its STD benefits claim approval.[7] (*Compare* Admin. R., PAGEID # 144 *with* PAGEID # 347.) It therefore supports Ms. Hoffman's argument that the disability she originally claimed, and ALIC originally approved, persisted beyond October 1, 2017.

The Court also finds that the Rehabilitation Assessment Report adds relevant information to Ms. Hoffman's claim file. The Plan disagrees, and lists several diagnoses, prescriptions, and treatment notes that it maintains were considered through Dr. Grattan and Dr. Gross's file reviews. But the Report includes the results of Mr. Zak's in-person examination and evaluation of Ms. Hoffman's functional capacity, and constitutes the only vocational expert opinion in the administrative record. Significantly, Mr. Zak observed that Ms. Hoffman "demonstrates reduced functional capacities with regard to physical capacities for standing, walking, lifting, carrying, handling, fingering, and supporting her body weight with her upper extremities." (*Id.*, PAGEID # 368.) He acknowledges that medical "records differ with regard to the etiology of her symptoms and these reduced capacities." (*Id.*) Nonetheless, he concludes "to a reasonable degree of vocational certainty [that] Ms. Hoffman has experienced diminished vocational

---

[7] Although ALIC's initial approval of benefits identifies August 14, 2017 as the first date on which STD was approved, the Plan imposes a five-business day elimination period. (*See* Admin. R., PAGEID # 74.) Accordingly, an August 14, 2017 benefit start date indicates disability beginning on August 7, 2017.

options[.]" (*Id.*, PAGEID # 370.) The BAC's failure to consider the Rehabilitation

Assessment Report weighs in favor of finding its decision arbitrary and capricious.

### 4. The BAC's failure to supplement Dr. Gross's file review weighs in favor of a finding for Ms. Hoffman.

Ms. Hoffman finally argues that the BAC erred in adopting "wholesale" Dr.

Gross's opinion. For two reasons, the Court finds that the BAC's reliance on Dr.

Gross's file review does not reflect a deliberate, principled reasoning process.

First, the Plan provides that, if a second-level "appeal is related to clinical

matters, the [BAC's] review *will be done in consultation with a health care*

*professional with appropriate expertise in the medical field* and who was not

involved in the prior determination." (*Id.*, PAGEID # 99 (emphasis added).) As the

Plan points out, it is "a fundamental principle of ERISA law—the plain language of

the plan controls." *West v. AK Steel Corp. Retirement Accumulation Pension Plan*,

318 F. Supp. 2d 579, 585 (S.D. Ohio 2004) (Beckwith, J.) (citation omitted). Dr.

Gross stated that his review was limited to "an Orthopedic perspective" and

expressly declined to opine on Ms. Hoffman's neurological symptoms. (Admin. R.,

PAGEID # 332, 336.) In light of the clear medical evidence in the record

establishing that Ms. Hoffman's symptoms and diagnosis are neurological (*see, e.g.,*

*id.*, PAGEID # 155 (Dr. D'Eramo's work-from-home limitation was due to "pain from

[right] sided neuritis"), PAGEID # 158 (Dr. Lum's letter clarifying that Ms.

Hoffman's is "not vascular TOS; but rather, neurogenic TOS"), PAGEID # 315 (Dr.

Grattan acknowledges that Ms. Hoffman's persistent pain was "likely due to

neuropathy")), the BAC should have addressed the neurological aspect of Ms.

Hoffman's claimed disability. Its failure to do so—particularly when Dr. Gross stated that his medical expertise (orthopedics) was not the appropriate expertise to evaluate Ms. Hoffman's most significant symptoms—is not indicative of a deliberate, principled reasoning process.

Second, Dr. Gross's review and conclusions seem at odds with Dr. Lum's December 31, 2017 letter. Dr. Gross's file review emphasizes the lack of "objective findings" supporting Ms. Hoffman's "self-reported complaints." (*Id.*, PAGEID # 336–37.)  But Dr. Lum, Ms. Hoffman's treating surgeon, explained:

> Neurogenic thoracic outlet syndrome (nTOS) is a subject and controversial diagnosis; unlike cancer, where a definitive biopsy of abnormal cells may be obtained to confirm the diagnosis, such a diagnostic/specific test for nTOS does not exist.

(*Id.*, PAGEID # 157.) Dr. Lum then laid out the Society for Vascular Surgery's criteria for diagnosing nTOS, concluded that Ms. Hoffman satisfied all [four] criteria for diagnosis, and explained why certain unremarkable diagnostic test results are not inconsistent with the nTOS diagnosis. (*Id.*, PAGEID # 158.) Although Dr. Gross lists Dr. Lum's letter in the list of records reviewed (*see id.*, PAGEID # 332), he does not discuss or explain why a focus on objective findings is appropriate in light of Dr. Lum's letter. The BAC did not fill this gap.

The failure is significant for two reasons: First, it begs the question why the BAC did not order an in-person examination of Ms. Hoffman. The Plan provides that STD benefits may be terminated on a claimant's failure to "submit[] to an independent medical examination when determined to be appropriate by the Plan

Administrator, or its delegate." (*Id.*, PAGEID # 77.) In this regard, the Sixth Circuit has held:

> [W]hile . . . reliance on a file review does not, standing alone, require the conclusion that [a defendant] acted improperly, . . . the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

*Calvert*, 409 F.3d at 295. This is such a case. And second, the BAC leaves Dr. Lum's letter opinion entirely unaddressed. "[W]hile a plan administrator need not accord controlling weight to a treating doctor's opinion, the failure to deal with that opinion at all can be one factor in determining that the plan's decision is arbitrary rather than reasoned." *Tanner v. Nationwide Mut. Ins. Co.*, 804 F. Supp. 2d 601, 614 (S.D. Ohio 2011) (Watson, J.). *See also Glenn*, 461 F.3d at 673; *Elliott v. Metro. Life Ins Co.*, 473 F.3d 613, 620 (6th Cir. 2006). The BAC's decision to rely so heavily on Dr. Gross's file review, in light of the specific circumstances of this case, weighs in favor of a finding that its determination was arbitrary and capricious.

The Plan argues for an alternative conclusion, noting that the Sixth Circuit has held that a plan administrator can require a claimant to provide objective medical evidence of disability, even where, as here, such a requirement does not appear among the plan terms. (ECF No. 24, 16) (*citing Hunt v. Metro. Life Ins. Co.*, 587 F. App'x 860, 862 (6th Cir. 2014)). The Court does not dispute the proposition— but it is not the prevailing consideration in this case where benefits were approved, then terminated without evidence of a change in the claimant's condition, only for substantial and relevant supplemental information to be reviewed on paper alone if at all. As this Court has previously explained, "it is one thing to insist that some

objective evidence of a potentially disabling condition be submitted . . . and another to insist that the objective evidence be sufficient to resolve all of the issues in the case . . . " *Tanner*, 804 F. Supp. 2d at 613. The Plan's emphasis on objectivity, in this case, is unavailing.

### B. Finding and Award

In view of the above, the Court finds that the Plan's termination and denial of Ms. Hoffman's claim for STD benefits cannot stand. The Plan's reasoning process was not deliberate and reasoned, rendering the decision arbitrary and capricious. Ms. Hoffman's Motion for Judgment on the Administrative Record is **GRANTED**. The Plan's Motion is **DENIED**.

"In cases such as these, courts may either award benefits to the claimant or remand to the plan administrator." *Elliott*, 473 F.3d at 621 (citation omitted). Remand is appropriate for "further fact-finding to supplement what [is found to be] an incomplete record." *Javery*, 741 F.3d at 700. It is inappropriate, however, to "afford[] the plan administrator a chance to correct its reasoning for rejecting [p]laintiff's application." *Id*. Further fact finding is unnecessary here. The record includes substantial medical and other evidence establishing by a preponderance that Ms. Hoffman was STD Disabled through February 28, 2018—the maximum period of STD benefits available under the Plan.

## IV.    CONCLUSION

For the reasons set forth above, the Plan's Motion for Judgment on the Administrative Record (ECF No. 25) is **DENIED** and Ms. Hoffman's Motion for Judgment on the Administrative Record (ECF No. 24) is **GRANTED**. The Plan is **ORDERED** to pay Ms. Hoffman an amount equal to the STD benefits she would have been paid for the period of October 2, 2017, through February 28, 2018. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio.


**IT IS SO ORDERED.**


/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**